In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1785

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

PAUL VAN EYL,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 287—**James B. Zagel**, *Judge.*

ARGUED MAY 8, 2006—DECIDED OCTOBER 2, 2006
AMENDED OCTOBER 5, 2006[Œ]

Before BAUER, RIPPLE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Paul Van Eyl went to trial on a twelve-count indictment for various financial crimes. The jury hung on ten of the counts and returned a verdict of guilty on the other two. The district court granted Van Eyl's subsequent motion for a new trial because the government's closing argument contained a damaging theory of guilt that the court had earlier excluded in response to a motion *in limine.* Although the argument was made in good faith, and although the court overruled the defendant's

---

[Œ] The opinion is hereby amended to include the inadvertently omitted concurrence by Judge Bauer.

objection in the heat of the closing arguments, the court later determined that the argument was improper and likely had a substantial effect on the verdict in this very close case. The government appeals the grant of a new trial. Because of the deferential review we accord such decisions, we affirm.

## I.

Van Eyl worked for First Merchants Acceptance Corporation ("FMAC"), a finance company specializing in the subprime auto lending market. Van Eyl served as vice president for strategic planning and risk management. Mitchell Kahn, a lawyer who co-founded FMAC and served as its chief executive officer, was Van Eyl's co-defendant. Kahn pled guilty and cooperated with the government in its prosecution of Van Eyl. FMAC was in the business of lending money at above-market interest rates to people with problematic credit histories so that they could purchase cars. The company's primary asset was its accounts receivable, which FMAC used to secure a line of credit with LaSalle Bank, the company's primary source of funds. Given the nature of FMAC's business, not all of the customer accounts were current at any given time, with some customers being so late in their payments that their accounts were charged off as a loss. Because of delinquent accounts, two important aspects of FMAC's business were collections and repossessions. Accounts receivable were tracked by a computer system called Norwest, which was run by an outside contractor. The Norwest system grouped delinquent accounts into thirty-day increments (called "buckets" in the system) depending on how late the customers were in paying. For example, the thirty-day bucket contained accounts that were thirty-one to sixty days late in payment, the sixty-day bucket was comprised of accounts that were sixty-one to ninety days late, and the ninety-day

bucket contained accounts more than ninety-one days delinquent. Tracking the lateness of payments was a crucial function because only relatively current accounts receivable could serve as collateral when FMAC needed financing. LaSalle Bank extended to FMAC a line of credit capped at $205 million, secured by accounts receivable, and permitting a monthly draw equal to 80% of eligible receivables. These loans were repaid out of incoming cash when FMAC customers made their monthly car payments. FMAC was a publicly traded company and shareholders and potential investors relied on company policies and the value of accounts receivable in making investment decisions. These policies and values were revealed in SEC filings that listed assets and liabilities. In its SEC filing for the year ending December 31, 1996, for example, FMAC reported that it charged off as a loss the balance left on any account that was more than ninety days delinquent. In some instances, FMAC was able to repossess the car and recover some of the outstanding balance of a loan; in other cases, the car disappeared along with the borrower and the account was a total loss.

Van Eyl interacted with a number of other FMAC employees in the course of his job. Julie Freisinger was FMAC's liaison to the contractor that ran the Norwest system. Tom Ehmann was the chief financial officer, Brian Hausman (who co-founded the company with Kahn) was in charge of operations, and Peter Gorman was a specialist in collections. Van Eyl also worked closely with Kahn. Part of Van Eyl's job was to compile data from Norwest and keep track of delinquent accounts and charge-off rates on a monthly basis, and to use that data to project future charge-offs on an annualized basis. Van Eyl regularly submitted this information to Kahn. Some of this information was reported in FMAC's SEC filings and was also used in presentations to investment bankers to promote investment in FMAC. The charge-off rate was a very important number to

potential investors because it was highly correlated to profitability, potential future earnings, and the value of FMAC's stock.

Early in 1996, senior management responsible for reviewing this data noticed that the charge-off rate was steadily climbing. The norm in the industry was 6-8% and FMAC was charging off 9-10% of its loans. Collection efforts, directed by Gorman, were slipping and delinquency rates were rising. Van Eyl conceded at trial the events that ensued from the rising delinquencies but vigorously contested the issue of his involvement and intent in these events. According to the government, Ehmann suggested to Kahn that in order to hide FMAC's problems, they should manipulate FMAC's financial reporting. At first, Kahn and Ehmann tried keeping the books open, that is, posting payments received in one month to the previous month in order to minimize the delinquency rate for the previous month. They soon realized that this practice merely delayed the inevitable. Kahn then approached Van Eyl about manipulating the accounting. Kahn, Ehmann and Van Eyl discussed several strategies and decided to postpone charging off accounts that were more than ninety-one days overdue, to grant deferrals on some accounts and to treat "skips" as if they were "repos." "Skips" were delinquent accounts where neither the customer nor the car could be located. FMAC's policy was to charge-off as a loss the entire balance of these accounts. "Repos," shorthand for repossessions, were delinquent accounts where the car could be located, recovered and re-sold. Repossessions typically resulted in recovery of approximately 55% of the remaining balance of an account, and for this reason, FMAC's policy was to charge-off as a loss 45% of the balance on a repossession. Treating a "skip" as if it were a repossession on the company books meant that only 45% rather than 100% of the balance was written off as a loss even though the remaining 55% was virtually uncollectible. In order to

implement these changes, Van Eyl directed Freisinger (the Norwest system liaison) not to enter skips and repos into the system until he instructed her to do so. Van Eyl then told Freisinger to place some skips into repo status and charge off others. Van Eyl did not specify which accounts to treat differently but rather gave Freisinger a dollar amount of skips to charge off and a dollar amount to change to repo status and left it to her to determine which accounts to change to achieve the desired accounting results. Charge-off decisions were thus based not on collectibility but on achieving certain accounting numbers.

According to the government, this practice continued from June 1996 through January 1997. During that time, Kahn, Ehmann and Van Eyl represented publicly that accounts more than ninety-one days delinquent were being charged off. Nonetheless, delinquencies continued to rise and Kahn discussed new strategies with Van Eyl. Out of these discussions came the customer service deferral program. A deferral was an agreement between FMAC and the borrower to defer a monthly payment to the end of the loan period. Deferrals are a legitimate practice in the lending business, typically used to assist borrowers through a brief period of money trouble without having the account reported as delinquent. FMAC's original informal policy was to grant deferrals for good cause, but FMAC's lenders placed limits on the practice. Accounts that received three one-month deferrals over the life of the loan or two deferrals in a single year could no longer serve as collateral. Accounts that were more than ninety days delinquent were not eligible for deferral. In its short existence, the customer service program accorded deferrals to approximately 9,300 ineligible accounts with balances totaling more than $109 million.

In March 1997, Ehmann, the CFO, was replaced by Norman Smagley. Soon thereafter, Brian Hake, FMAC's treasurer, told Smagley that the high number of deferrals granted in 1996 violated FMAC's agreements with outside

lenders. Hake tendered his resignation over the manipula-
tion of the charge-off figures. Richard Zielinski, FMAC's
internal auditor, also approached Smagley to report that he
had discovered that skips were being entered into the
Norwest system as repos and that seriously delinquent
accounts were not being charged off. Zielinski demanded
that Smagley report these findings to the audit committee
of the board of trustees. Smagley did so and an investi-
gation followed. As a result, the board terminated Kahn,
Ehmann, Freisinger and Van Eyl, and issued a press
release stating that FMAC's financial reporting was not
accurate. The company issued restatements of its SEC
filings for 1996, bankruptcy ensued, and FMAC's creditors
ultimately lost $13 million.

Van Eyl had a completely different view of these events.
According to Van Eyl, FMAC's ninety-one day charge-off
policy was very conservative by industry standards. That
policy was changed to 121 days in late 1996, and this
change was fully disclosed to FMAC's outside auditors
and was revealed in SEC filings. Van Eyl believed that
the rising delinquency rates were more related to poor
efforts in the collections area than to the quality of FMAC's
loan portfolio. Of the many possible solutions to these
problems, the customer service program was selected to
remedy some of the problems created by poor collec-
tion efforts. Van Eyl, who was in his late twenties at the
time of these events and who had no prior experience in the
industry, believed Kahn when he assured Van Eyl that the
changes made were legitimate business practices that had
been cleared with the board of directors and with the
company's lenders. Although the government portrayed the
customer service program as a sham, Van Eyl's theory of
defense was that there were ample reasons for Van Eyl and
others to believe that the program was a legitimate and
appropriate means to address the collections problems.
According to Van Eyl, the customer service program was

fully disclosed, all deferrals were recorded in the Norwest system, all the relevant records were provided to outside auditors, and all relevant information was disclosed in the SEC filings.

At trial, Kahn testified against Van Eyl, claiming that he discussed with Van Eyl hiding the fact that delinquency rates were rising along with charge-off rates. Kahn admitted that he made the decision to manipulate the financial data but that Van Eyl had operational control over charge-offs with the help of Steve Zemaitis, an FMAC analyst who reported to Van Eyl, and Freisinger. Gorman testified that he told Van Eyl that the customer service program did not make sense to him and that he thought "somebody is going to have some issues at the Securities and Exchange Commission, is going to have issues with this and in my mind somebody is going to go to jail for this." Tr. at 1941. Gorman testified that Van Eyl's response to this was that the program was a common and acceptable practice in the industry. According to Gorman, at the end of this conversation, Van Eyl went down the hallway to Kahn's office. Tr. at 1942.

Before trial, Van Eyl moved *in limine* to exclude lay opinion testimony or evidence on issues of law or conclusions of fraud. Van Eyl was concerned that many of the government's lay witnesses would express opinions about the "fraudulent" or "improper" nature of Van Eyl's conduct and the customer service program, or offer opinions about his intent. In reviewing FBI reports produced by the government, Van Eyl cited many statements by witnesses that he believed crossed this line. For example, Zemaitis told investigators that some of the financial scenarios Zemaitis created and gave to Kahn and Van Eyl were "clearly improper treatments of the accounts," and that "the most egregious fraudulent activity that took place" involved the deferrals granted in December 1996. Zemaitis also opined that Kahn and Van Eyl "were attempting to manipulate the charge-off statistics" presented to the board

of trustees and to the public. Zemaitis' language to investigators was replete with words indicative of legal conclusions like "fraud," "improper elements," "improper balance adjustments," "manipulations," and "fraudulent activity." Similarly, Zielinski spoke about "fraudulently-treated previous month's transactions," and "improper activity" in handling the accounts. Citing Federal Rules of Evidence 701, 401 and 403, Van Eyl sought to exclude any lay opinion testimony regarding issues of law. In its written response to the motion, the government agreed with Van Eyl that lay opinion on the unlawfulness of Van Eyl's conduct or whether the conduct violated particular statutes was properly excluded. The government assured the court that with one exception that we discuss below, it did not intend to solicit such lay opinion testimony. The government argued, though that lay testimony "concerning the wrongfulness or dishonesty" of Van Eyl's conduct was not a legal conclusion but rather was within the daily experience and common knowledge of ordinary people. As such, the government argued, it should not be excluded. The government reasoned that if Van Eyl intended to rely on a defense of good faith, it should be allowed to present the testimony of his co-workers to help the jury gauge the reasonableness of Van Eyl's belief that his conduct was permissible. The government expected this kind of testimony to come from Robert Mark, the FMAC employee in charge of the company's repossession efforts, Steve Zemaitis, the FMAC analyst who reported to Van Eyl, and Richard Zielinski, the internal auditor. The government cited Gorman as a special case because he had told Van Eyl directly that the deferrals were improper, that the SEC would investigate and that someone would be going to jail. The government contended that his testimony was directly relevant to prove notice to Van Eyl that his conduct was unlawful and to rebut his contentions that he was acting in good faith.

The district court noted that, in some lay witness testimony, there is a fine line between fact and opinion. Tr. at 3.

The court therefore directed Van Eyl's attorney to raise his concerns about each government witness. Using expected witness Zielinski as an example, Van Eyl's counsel objected because this witness had little first-hand knowledge of the underlying facts. Tr. at 4. The government informed the court that Zielinski would testify about non-conformance with the company's announced policies, and would testify that the company books were improperly affected, prompting him to approach the new CFO with his concerns. The court warned the government, "Well, the words matter. The words matter. The words he is going to utter matter." Tr. at 5. The prosecutor assured the court, "I certainly do not intend to ask him whether it was unlawful," but instead wished to ask the witness if certain conduct complied with general accounting principles and with company policy. Tr. at 6-7. The court noted that the witness could explain his conduct of going to the CFO by stating that he noticed an irregularity in the books or that he thought something was not in compliance with company policy. In such a case, the court noted, the statement would not be offered for the truth of the matter (*i.e.*, the jury could not use the statement as substantive evidence of irregularity or improper conduct) but to show why the witness approached the CFO. Tr. at 7-8. With this understanding, the trial proceeded.

During the trial, defense counsel objected each time the prosecutor crossed the line of the *in limine* ruling. The court sustained an objection to the prosecutor asking Zemaitis, "Do you need to be a CPA to tell the difference between the truth and a lie?" Tr. at 442. The prosecutor also attempted to elicit testimony from Freisinger that she lost a great deal of weight during this time period because of the long hours she was working and because she had anxiety that what she was doing was not right. Tr. at 732-25. The court sustained defense counsel's objection to this line of questioning, allowing the witness to testify only that she lost weight due to her long hours. Tr. at 734-35. The court allowed this

limited testimony because the defense intended to question Freisinger's ability to recall these events and the extreme weight loss caused by long hours bolstered why she remembered the time period. The court did not allow the government to elicit testimony that Freisinger had anxiety that what she was doing was not right. The government later asked an FMAC manager whether he was "suspicious" of the customer service program, and the court sustained the defense objection. Tr. at 602. The court instructed the government that even Gorman was not allowed to opine on the law, but could testify that he went to Van Eyl to tell him that he thought the program was improper. Tr. at 1925-27. When Kahn testified, the district court ruled that the "gloves are off with respect to this particular witness" because he was a co-defendant who had pled guilty. Tr. at 1433. The court therefore allowed him to testify that he believed certain conduct was fraudulent or illegal.

In closing argument, the defense argued that the government failed to prove that Van Eyl acted with the intent to defraud. Specifically, defense counsel argued that the evidence supported a finding of good faith because the customer service program was not hidden but was well-known throughout the company, that criteria were developed for the program and a task force was assigned to implement it, that the program was successful in returning defaulted borrowers to regular payment schedules, and that Van Eyl had been assured by Kahn that the board of directors and the company's lenders knew about and approved the program. Moreover, the large number of deferrals in the fall of 1996 had been voluntarily disclosed in the company's SEC filings and to FMAC's bank group well before allegations of misconduct surfaced.

In rebuttal, the prosecutor attempted to utilize the opinions of lay witnesses about the fraudulent nature of the conduct in order to demonstrate Van Eyl's intent. The prosecutor stated that Zemaitis "could recognize right from

wrong. He became so nervous at having to . . ." Tr. at 121.[1] Defense counsel interjected, "Your Honor, I am going to object to this. That testimony was for a limited purpose, not for this type of argument, your Honor." Tr. at 121. The court overruled the objection and the prosecutor went on to make similar comments about other witnesses. Specifically, the prosecutor argued that Zielinski "was able to tell right from wrong. He was able to tell a fraud is a fraud." Tr. at 122. Addressing the testimony of Gorman, the prosecutor argued that "it is not necessary to have a college education to tell right from wrong, truth from false, a fraud from a good business deal. Mr. Gorman has not lost his moral sense. He could tell that." Tr. at 123. Hammering the point home, the prosecutor said that Brian Hake could "tell right from wrong. He could tell truth from false. He could tell fraud when he saw one." Tr. at 123-24. As to Smagley, the prosecutor stated that "he could tell there was a fraud" because he "could tell right from wrong. He could tell truth from false and he went to the audit committee." Tr. at 124. The prosecutor also contended that the members of the audit committee "could tell truth from false," and that the board of directors "could tell right from wrong." Tr. at 124-25. Referring to the board of directors, the prosecutor closed the circle on this line of argument:

> [T]hey could tell what any reasonable person can tell, with or without a college education. They could tell what Peter Gorman could tell, what Rich Zielinski could tell, what Norman Smagley could tell, what Steve Zemaitis could tell. They could tell that this was a fraud. There is no valid business reason for doing this.

Tr. at 126.

---

[1] For closing arguments, the pagination of the transcript begins anew at page 1. All references to closing arguments are to the April 29, 2003, transcript.

The jury could not reach a verdict on ten of the twelve counts against Van Eyl but found him guilty of Counts I (wire fraud) and Count III (filing a false and misleading statement with the SEC). Van Eyl moved for a new trial on the grounds that the prosecutor's rebuttal argument was improper, prejudicial and in violation of the court's *in limine* ruling. He also moved for a judgment of acquittal. The district court denied the motion for a judgment of acquittal but granted the motion for a new trial. The court rejected the government's motion for reconsideration. The government now appeals.

**II.**

On appeal, the government argues that the rebuttal argument did not violate the court's *in limine* ruling, that the argument drew fair inferences from admissible evidence, that the rebuttal was invited by Van Eyl's closing argument, and that any error was harmless. The government also contends that Van Eyl did not adequately preserve his objection to most of the comments and that we should review the district court's ruling during closing argument for plain error. Under the plain error standard, the government continues, a new trial should not have been granted unless the defendant probably would not have been convicted but for the alleged error. Because this is not the standard the district court applied in granting the new trial, the government urges us to find that the court erred, and asks that we reinstate the verdicts on Counts I and III.

**A.**

The government argues that Van Eyl forfeited his objections to most of the government's rebuttal argument by not continuing to object after the district court overruled the first objection to this line of argument. The district court disagreed:

> When the prosecutor violated that in limine ruling during closing argument, I overruled the objection. While the objection was not as full as it should have been, not as sufficient as it could have been, and perhaps deficient in giving me all the information I needed, I am reluctant to find waiver because I did understand the objection to refer to the form of argument that was being made. I overruled it, I recall, because I thought the door had been opened by the defense argument and, more importantly, because I thought the focus of the argument would be on the testimony of Peter Gorman.

*United States v. Van Eyl*, Case No. 02 CR 287, Memorandum Opinion and Order, at 5 (N. D. Ill. July 13, 2004) (hereafter "Memorandum Opinion"). The government concedes that, at worst, this failure to continue objecting would be a forfeiture rather than a waiver, and contends that we should therefore review the issue for plain error only. Van Eyl correctly points out that the purpose of the rule on forfeitures is to give the district court the first opportunity to correct any errors that might arise. *United States v. Rogers*, 382 F.3d 648, 650 (7th Cir. 2004). The district court understood Van Eyl's objection to be to the entire line of argument and thus no purpose would have been served by forcing Van Eyl's lawyer to continue to object. The objection was thus adequately preserved. Moreover, Van Eyl had raised the issue in a motion *in limine* and the district court's ruling on that motion was definitive, not provisional or tentative in any way. *See Wilson v. Williams*, 182 F.3d 562, 563 (7th Cir. 1999) (*en banc*) (once an *in limine* ruling is definitive, the function of the objection requirement has been served and no further objection need be made at trial). By any standard, the issue was preserved.

On the defendant's motion, a district court may grant a new trial "if the interest of justice so requires." Fed. R.

Crim. P. 33(a). We review the district court's decision to grant a new trial for abuse of discretion. *United States v. Gillaum*, 372 F.3d 848, 857 (7th Cir.), *cert. denied*, 543 U.S. 969 (2004). If the judge in the course of analyzing the motion resolves a pure issue of law, our review is plenary. *See United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995). A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996). The district court judge is always in a better position than appellate judges to assess the probable reactions of jurors in a case over which that district judge has presided. *Berry*, 92 F.3d at 600. For this reason, we will not overturn that decision unless we are strongly convinced that it is incorrect. *Berry*, 92 F.3d at 600; *Boyd*, 55 F.3d at 242. We noted in *Boyd* that this is not only the rule; it is the dictate of common sense. *Boyd*, 55 F.3d at 242. The trial judge has heard and watched the testimony of the trial witnesses and the arguments of counsel. The trial judge had the opportunity to observe the jurors as they listened to the testimony and arguments and could gauge the impact of the testimony and arguments on the jurors. We are confined to reading the transcript and cannot duplicate the trial judge's experience of the trial. *Boyd*, 55 F.3d at 242. The trial judge "may have been mistaken; we might suspect that he *was* mistaken; but unless we are *convinced* that he was mistaken, we have no warrant to reverse." *Boyd*, 55 F.3d at 242 (emphasis in original). With those standards in mind, we turn to the government's arguments.

**B.**

The government first contends that the rebuttal argument did not violate the court's *in limine* ruling. The government argues that Van Eyl's motion sought only to bar opinion *testimony* by lay witnesses on the legality of Van Eyl's

conduct and did not apply to *argument* on that same subject matter. There was nothing in the court's ruling, according to the government, that prohibited the prosecutor from drawing inferences in the closing argument from testimony that was admitted without objection. The government contends that the prosecutor drew a fair inference that various witnesses could tell right from wrong and truth from falsity based on their testimony that they had concerns about inappropriate actions and irregularities. Moreover, the government believed this argument might be permissible because the district court commented that there was little difference between offering these witness statements about irregularities for the truth of the matter (which the court did not allow) and offering them to show why the witnesses took certain actions (which the court did allow). The government also faulted the district court for stating that its original *in limine* ruling excluded the moral as well as the legal opinions of witnesses.

The district court noted that its ruling should not be interpreted as a judgment that the prosecutor violated any standards of professional ethics, characterizing the rebuttal errors as "honest mistakes made in good faith by a lawyer who has in his appearances . . . demonstrated a high standard of professional ethics and a sense of fairness toward opposing parties." Memorandum Opinion at 10-11 n.3. We echo that sentiment; there is certainly nothing in the record to indicate otherwise and on this matter we defer to the trial judge. That said, none of these scattershot arguments hit the mark. The difference between offering testimony for the truth of the matter asserted and offering it to demonstrate why a person took a particular action is a subtle distinction that might be lost on jurors, but that was all the more reason to keep the lines clear, not a reason to cross or blur the line. Nor is there any logic to a contention that the court meant to allow in the rebuttal argument what it found unfairly prejudicial in testimony. The court

did not wish to allow lay witnesses to testify about their beliefs that Van Eyl's actions were unlawful because the court believed the jury would inappropriately use those witnesses' opinions to determine Van Eyl's state of mind. Having barred that testimony, the court did not intend to allow the government to bring that theory in through the back door of closing argument unless the defendant invited this response, a theory we will address and reject shortly. Nor did the district court mischaracterize its own ruling by stating it barred moral as well as legal opinions from lay witnesses. When we read the district court's ruling on the motion, it is clear that the court did not wish to allow lay witnesses to offer their opinions about the wrongness (in any sense of that word) of Van Eyl's conduct. Again, the court feared the jury would conclude that if others thought the conduct was wrong, then Van Eyl must have possessed the intent to defraud. For the purposes of the court's ruling, there was no distinction between moral opinions and legal opinions. And it was well within the district court's discretion to exclude lay opinion testimony (and argument utilizing lay opinion testimony) about Van Eyl's state of mind. *United States v. Hauert*, 40 F.3d 197, 200-01 (7th Cir. 1994), *cert. denied*, 514 U.S. 1095 (1995).

The government also argues that the argument was invited by Van Eyl's closing argument. Indeed, when the court ruled on Van Eyl's objection to the government's rebuttal, the court believed that Van Eyl's lawyer had "opened the door." After further reflection, the district court changed course:

> After further consideration, however, I think the door had not been opened. Substantially, the focus of the defense argument was not that others thought everything was all right; rather, the focus was that Van Eyl was not *told it was wrong*. The prosecution was not forced to make the argument it did in rebuttal.

Memorandum Opinion at 5 (emphasis in original). We have reviewed the closing arguments of both the government and the defense. Defense counsel's closing argument focused on the lack of government evidence proving beyond a reasonable doubt that Van Eyl had an intent to defraud. Counsel also argued that Van Eyl was not at all involved in the preparation of certain financial statements. Van Eyl's lawyer did not comment on what others at the company thought about the customer service program or other conduct, and thus there were no misimpressions to correct. In short, we think the district court did not err in determining that the rebuttal argument was not invited.

## C.

Finally, the district court found that the error prejudiced Van Eyl enough to warrant a new trial. The government argues that Van Eyl was not prejudiced, and that any error was harmless. The government again urges us to use the plain error standard. Under that standard, the government maintains that Van Eyl is not entitled to a new trial unless he probably would not have been convicted but for the error. As we explained above, plain error review is inappropriate here because Van Eyl properly preserved his objection. The applicable standard for the prejudice finding is whether there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *Berry*, 92 F.3d at 600. The district court determined that it did. In particular, the district court noted that Van Eyl never disputed what happened at FMAC; rather, his defense was that the government did not prove that he possessed the intent to defraud. The prosecutor's argument in rebuttal amounted to "if everyone else could see a fraud, then Van Eyl saw it too." Memorandum Opinion, at 4. The court commented, "The prosecutor should not have made this argument. It was powerful and persuasive, and it is impossible for me to

conclude that it, standing alone, did not affect the verdict." Memorandum Opinion, at 6. The court weighed this error against the strength of the evidence at trial. This was a close case, with the jury unable to reach a verdict on ten of the twelve counts. The government's best evidence of Van Eyl's intent was Gorman's testimony that he told Van Eyl that the conduct was wrong and that someone was going to go to jail for it. The court very carefully parsed the cross-examination of Gorman, who was impeached on a number of key points. Carefully weighing the effect of the prosecutor's powerful (albeit erroneous) argument against relatively weak evidence from an impeached Gorman and an even less credible Kahn, the court found the error sufficiently prejudicial to warrant a new trial. This is precisely the type of determination that is owed our deference on appeal. The district court heard all the evidence, watched both the witnesses and the jury, and was in a much better position to judge whether the improper argument tipped the scale against Van Eyl in the verdict on those two counts. There was, in short, a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *Berry*, 92 F.3d at 600. In reviewing the trial judge's determination to grant Van Eyl a new trial, we are not "convinced that he was mistaken," and thus "we have no warrant to reverse." *Boyd*, 55 F.3d at 242. We therefore affirm the district court's judgment.

                                              AFFIRMED.

BAUER, *Circuit Judge*, concurring.  I submit a reluctant concurrence. I believe, overall, the defendant received a fair trial and the verdict was amply supported by the evidence. And, in a case like this, opinion evidence of accounting practices and procedures, and how legitimate business differs from illegal or fraudulent business practices, almost

necessarily carries expert testimony—and prosecution comments on it—into what I consider to be not inappropriate areas.

Nevertheless, the opinion of the majority is quite correct: Our standard of review over the decision of the district court to grant a new trial is exceedingly deferential. I emphasize that the prosecutor was not to blame and, had the trial court denied the motion for a new trial, a guilty verdict would have been easy to sustain.

A true Copy:

      Teste:

                      _____
                      *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*