NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued September 11, 2008
Decided November 4, 2008

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

RICHARD A. POSNER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

Nos. 07-3093, 07-3250, 07-3292, 07-3435

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeals from the United States |
| *Plaintiff-Appellee,* | District Court for the |
| | Northern District of Illinois, |
| *v.* | Eastern Division. |
| GLENN SMITH, JOSEPH RUPERT, | No. 05 CR 972 |
| CHRISTOPHER PRICE, and | |
| LACHANDA MITCHELL, | Robert W. Gettleman, |
| *Defendants-Appellants.* | *Judge.* |

**O R D E R**

The four defendants here--Glenn Smith, Joseph Rupert, Christopher Price, and LaChanda Mitchell--were convicted, after a jury trial, on various mail and wire fraud charges. Although there was no doubt that a fraud scheme was in full operation, the issue for the jury was whether these defendants--all bit players--were active participants in the endeavor. The jury having answered "yes" to that question brings the case to us on the defendants' appeal. The defendants contend, relying on *United States v. Van Eyl*, 468 F.3d 428 (7th Cir. 2006), that the trial court improperly admitted certain lay-opinion testimony into evidence; the prosecution improperly emphasized that testimony; and the evidence was otherwise insufficient to convict. We start with the facts, viewed, as they must be at this time, in the light most favorable to the jury verdict.

The scheme in this case was destined to fail.  Like all scams, success hinged on keeping the victims in the dark, but the fraud was all too apparent for any lasting prosperity.  The "brains" behind the operation was a man named Frank Panice.  Panice created the "Receiver Corporation" to serve as a vehicle for the fraud.  Though it is unclear when Receiver first came into existence, things started heating up in the latter part of 2001 when Panice took Tony Volz, a twenty-something friend, under his wing, using him as the front man to run the company's day-to-day operations.  He told Volz that Receiver was an umbrella corporation with companies underneath it in a variety of industries that needed employees, and he wanted Volz to do the recruiting.[1]  Panice gave Volz a series of phone numbers he obtained from people looking for jobs, and later he got leads from resumes listed on job sites like *Monster.com* and *HotJobs.com*.

It was appropriate that Volz called the marks from the back of Panice's legitimate business, a candy store ("Candy Blossoms") in Downer's Grove; he suckered them with deals too sweet to resist.  Following Panice's instructions, Volz told each candidate that there was a position--perfectly matching the applicant's skill set--that it was located near his or her home, and that it paid a salary above what the applicant was seeking.  To get the job, however, candidates had to attend an orientation meeting, where Panice described the different business opportunities that were available.  He emphasized that he was looking for a "good fit," so only 3 percent of those at the meeting would receive a follow-up interview.  That was a lie.  Nearly all the applicants were called back for a second interview and tentatively offered employment.  Yet, there was a catch.  To begin work, candidates had to complete a "training program" paid for out of their own pockets.  Initially $250, Panice raised the cost to $450 when he realized applicants were willing to pay that much.  Once the money was collected, the scam turned into a game of hide-and-seek.  With delay tactics and excuses, Panice would dodge the victims until they gave up--or so he hoped.

Two months after the orientations began, Receiver moved into a space in Rosemont.  With a reception area and a group of small offices, the location provided an air of legitimacy.  As the money started flowing in, Receiver filled those offices with a few employees who in fact were paid for their services.  These employees were not hired through the bogus recruiting program; they were hired to facilitate that program.  They made calls to candidates and, as the operation grew, conducted some of the interviews.  Among this group were Price, Rupert, Smith, and Mitchell.  Volz told them Receiver was experiencing a growth spurt and had spots to fill all around the Chicago area.  They were paid in cash, usually between $300 and $600 per week.

Price began work in the summer of 2002.  Volz trained him to conduct the second-round, one-on-one interviews, but he only lasted until November.  Rupert, like the other defendants, was hired after the move to Rosemont.  However, he was the first to join and stayed for 15 months.  His job was to  conduct the first-round, group orientations.  Smith came on board in

---

[1]  Volz, who pled guilty to charges in the case and testified for the government, said he thought the operation was legit for the first few months, but he admitted to taking part in the scheme well after he discovered it was a fraud.

April 2002.  He was assigned to the call room and later trained to conduct the second-round interviews.  Smith stayed on the ship until it sank in December 2002.  Mitchell also worked to the bitter end--though she didn't start until August of 2002--operating the phones the entire time.

The scam more or less stayed the same with the new help in place, but things started to deteriorate.  Panice and Volz provided Smith, Mitchell, and the other folks manning the phones with a stack of resumes downloaded from job sites.  They used a script when placing calls, which mirrored the pitch developed by Panice.  The orientations turned into group affairs where, again, applicants were told the vast majority would not make it back for a second interview.  While this was an outright lie, candidates were none the wiser because the second-round interviews were conducted on an individual basis.  And many--perhaps most--were willing to pay the "training" fee *because* of the artifice; after all, they thought they were given an opportunity denied to 97 out of 100 of the attendees at the first session.

So what was going on here is fairly simple to understand:  the schemers panned various sources searching for people who were looking for a job, or at least a better job than the one they had; once located, the "prospects" were brought together but told that only a select few would have the goods to continue the process; all, however, were brought in for a second interview, and all must have thought they were special to get that far; and so, with a hook firmly in their mouths, they proceeded to cough up money, usually $450, to get "training" for jobs that actually didn't exist.  What is not quite so easy to understand is how over 400 hundred people fell for this scam and delivered more than $200,000 to the schemers.

As complaints from disappointed applicants started to flood in, Volz and Panice took steps to preserve the charade.  For applicants, the only channel of communication with Receiver during training was through e-mail.  They would send messages to IDtraining101@aol.com, and Volz would write back anonymously, signing off as "the training team."  Refunds were given to some applicants who complained loudly enough, but that was the exception, not the rule.  Panice would intervene on occasion (using an alias) when candidates asked for refunds, offering half-baked excuses and justifications.  So went the summer of 2002.

In September, Panice and Volz moved from Rosemont to the Chicago Mercantile Exchange building in an attempt to run away from their problems.  They also changed the company name to ISCS.  Panice's explanation to employees like Price, Rupert, Smith, and Mitchell:  Receiver was getting "a lot of negative press" but Panice "firmly believed in the company," and he changed the name "so people would not put two and two together."  Volz followed up by reiterating that there were jobs available for successful candidates, and employees need not worry that Receiver/ISCS was a hoax.  Volz said that although people were getting jobs, the training program was so intense only one in ten completed it.  Whether they bought this story or not, Price, Rupert, Smith, and Mitchell stayed on board.  Other employees, including Sabrina Hill Patterson, Erica Stevenson, and LaTanya Thompson, were neither fooled nor willing to continue with the scam; they hit the road once they figured out what was actually happening.

The defendants now ask us to reverse their convictions. They offer three arguments in support of this request. First, relying on *Van Eyl*, they say the district court abused its discretion by allowing hearsay and lay opinion testimony from coworkers who offered their beliefs about the illegality of Receiver/ISCS's operation. If they win on that score, they contend the error was compounded by the prosecutor's rebuttal argument emphasizing this testimony. Failing that, the defendants say the evidence was insufficient to prove they knowingly participated in a fraud.

We review decisions to admit or exclude evidence for an abuse of discretion. *United States v. Harris*, 536 F.3d 798, 807 (7th Cir. 2008). The same standard applies to a decision on a motion for acquittal or new trial. *United States v. Gillaum*, 372 F.3d 848, 857 (7th Cir. 2004); *United States v. Souffront*, 338 F.3d 809, 819 (7th Cir. 2003).

The defendants say the district court committed error by admitting testimony from the coworkers who quit, Patterson, Stevenson, and Thompson. Not so. In *Van Eyl*, we held that a district court acted within its discretion when it excluded lay opinion testimony from coworkers bearing on the legality of the defendant's conduct and then granted a new trial when the government violated this ruling in its closing argument.

The fraud in *Van Eyl* case seems all too common these days--desiring to appear healthier than it was, a finance company in the subprime auto lending market cooked its books. Paul Van Eyl was a vice president of the company who worked closely with the CEO. The CEO told Van Eyl that it was okay to postpone charging off severely delinquent accounts so the company could obtain better financing. "Charge-off decisions were thus based not on collectibility but on achieving certain accounting numbers." *Van Eyl*, 468 F.3d at 431. Van Eyl defended himself at trial by arguing that he lacked the requisite intent because he believed the CEO's assurances "that the changes made were legitimate business practices . . . ." *Id.* at 432. Van Eyl filed a motion *in limine* to exclude coworkers from testifying about the "fraudulent" or "improper" nature of his conduct or from opining as to his intent; in other words, to exclude lay opinion testimony on issues of law or conclusions that fraud was in the works. The district court ruled that witnesses could not use legally- or morally-charged words, but a witness employee could, for example, state that he thought something was amiss to explain why he reported concerns to the company's chief financial officer. Nevertheless, the prosecutor during closing attempted to use the opinions of lay witnesses to show that Van Eyl must have been in the know. The prosecutor said that everyone else "could tell there was a fraud," and Van Eyl was no different. *Van Eyl*, 468 F.3d at 434. We affirmed the decision to grant a new trial, deferring to the court's opinion on the jury's capacity to process the evidence and argument.

In so ruling, we recognized that the trial court was trying to police a fine line:

> The difference between offering testimony for the truth of the matter asserted and offering it to demonstrate why a person took a particular action is a subtle distinction that might be lost on jurors, but that was all the more reason to keep the lines clear, not a reason to cross or blur the line. Nor is there any logic to a

contention that the court meant to allow in the rebuttal argument what it found unfairly prejudicial in testimony. The court did not wish to allow lay witnesses to testify about their beliefs that Van Eyl's actions were unlawful because the court believed the jury would inappropriately use those witnesses' opinions to determine Van Eyl's state of mind. Having barred that testimony, the court did not intend to allow the government to bring that theory in through the back door of closing argument . . . . Again, the court feared the jury would conclude that if others thought the conduct was wrong, then Van Eyl must have possessed the intent to defraud. . . . And it was well within the district court's discretion to exclude lay opinion testimony (and argument utilizing lay opinion testimony) about Van Eyl's state of mind.

*Van Eyl*, 468 F.3d at 437.

None of this is helpful to the defendants in our case. *Van Eyl* had to do with the danger of lay opinion testimony concerning the wrongful nature of a defendant's action and his state of mind, but the coworker witnesses here did not offer such testimony.

Patterson's testimony suggested that the fraud was obvious. As Patterson made her way through a stack of resumes, she called a man who had a past run-in with the operation. He asked Patterson if this was "the same company that was scamming people in Rosemont?" Patterson, having no knowledge of the events in that office, answered "no." Later, Mitchell, who was Patterson's supervisor at the time, told her ". . . yes, this was the same company scamming people." So that sounds like a declaration--albeit hearsay--that the company was scamming people and Mitchell knew it. However, under the judge's instructions, the jury could *not* interpret Mitchell's supposed statement as proof of the matter asserted. (That is, the jury could not assume Receiver/ISCS was a scam because Mitchell said it was a scam.) The judge instructed the jurors that this was forbidden; they could only consider Patterson's testimony as an explanation for why she left the job and as proof that Mitchell was *aware* of the man's suggestion of fraud. *See Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008) (explaining that a statement is "not hearsay if it is used only to show notice").

As for Stevenson, she testified along with Patterson about a man who entered the office "yelling and screaming." Patterson said the man wanted his money back and threatened "to kill the whole office," including Mitchell, also a witness to the scene. According to Stevenson, the man added that he would call the FBI and see that the operation was "dealt with." Stevenson was so shocked she never returned. It was also the last straw for Patterson; not only did she leave, but she called the FBI herself. The district court allowed this testimony over objection but again told the jurors that they could only consider it to explain the witnesses' states of mind, how they reacted, and why they left.

The district court allowed the jury to hear Thompson's testimony with similar instructions. Thompson said she left her job working the phones because she "didn't feel very good about it," and she realized that the advertised jobs "weren't really available."

Allowing this testimony did not violate the principles we alluded to in *Van Eyl*. *Van Eyl* does not say a witness cannot testify as to his impressions about events he experienced; it simply says that it *may* be improper to allow a coworker to opine on a *defendant's* state of mind and the propriety of a *defendant's* actions. Receiver/ISCS was not a defendant in this case. Therefore, even if *Van Eyl* is thought to announce a rule of evidence, the witnesses' testimony in this case that they left because they thought the operation was a fraud does not come within its ambit. *See also United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990) (finding no error in allowing a witness to testify that he thought a home owned by the defendant was being used as a gambling house based on facts "known equally or better" by the defendant himself). Although these witnesses suggested their view that Receiver/ISCS was a scam, the court instructed the jury to consider that view only insofar as it explained their decisions to leave or showed notice on the part of the defendants. The witnesses did not say they thought the *defendants* knew the operation was illegal, or that the defendants should have known that it was. Unlike *Van Eyl*, the danger of considering the coworkers' testimony for a suspect purpose was not so great in this case. The district court did not abuse its discretion in admitting this testimony with the safeguard of a limiting instruction. After all, as Judge Bauer noted in his concurrence in *Van Eyl*, the standard of review is key in these cases. *See Van Eyl*, 468 F.3d at 438-39 (Bauer, J., concurring).

That leads to another critical point about *Van Eyl*, alluded to above--we did not announce a rule of evidence. We did not say that district courts must always act as the trial court in *Van Eyl* did --choosing to bar lay opinion testimony about the propriety of a defendant's action--but merely that the court did not abuse its discretion in so doing. The defendants' argument in this case fails to grasp this nuance. Approving a practice is not the same as mandating it.

Moreover, the defendants have not established prejudice. When a defendant lodges a timely objection, as the defendants in this case did, we ask whether there is a reasonable probability that the alleged error had a prejudicial effect on the verdict. *United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996). Only then is a defendant entitled to a new trial. *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998). In denying the motion for a new trial in this case, the district judge found that even if he erred in admitting the evidence, "[i]t certainly wasn't prejudicial." Indeed, the testimony of the coworker witnesses was *entirely consistent* with the defense theory. The defendants conceded that Receiver/ISCS was a fraud; they just said they didn't know it at the time. The coworker witnesses' testimony simply confirmed that it was scam. The fact that these witnesses testified they figured it out did not preclude the jury from crediting the defendants' contention that they, unlike their coworkers, remained ignorant. Ultimately it was a credibility determination--a function uniquely within the province of the jury--and prejudice does not exist merely because the jury found the defendants' version unbelievable.

For similar reasons, the government's rebuttal highlighting this testimony did not warrant a new trial. In their closings, the defendants argued that they were unaware Receiver/ISCS was a scam while they worked there. Defense counsel found it disturbing that Price, Smith, Mitchell, and Rupert were indicted when their coworkers were not, and asked the jury to consider where "the line in the sand" was, or even if there was one. The government responded to this point, explaining that "the line in the sand" was between those who quit upon realizing the operation was bogus (Patterson, Stevenson, and Thompson) and those who kept on working.

Because the district court did not abuse its discretion in admitting the coworker testimony, it follows that a new trial was not necessary when the prosecutor referenced it in his rebuttal argument. This is particularly so where the defendants invited the contrast they now impugn. *See United States v. Simpson*, 479 F.3d 492, 504 (7th Cir. 2007) (stating that a finding of prejudice is less likely where "the defense invited the response"). Defense counsel argued that there was no credible "line in the sand" separating the accused from the witnesses; the prosecutor explained that there was. This was a perfectly acceptable (and foreseeable) response.

Which takes us to the defendants' final argument – that the evidence was insufficient to support their convictions. We must reject this claim.

We start with Smith. Even if he didn't know it was a scam from the start, Smith admitted to an FBI agent that he eventually determined Receiver/ISCS was "not a legitimate company" and the only reason he stayed beyond that point was to get a job at one of Panice's firms that was on the up-and-up. Smith thought the one-in-ten claim about the training program was suspect because he took the tests himself and found them "very easy." And in response to a coworker's concern about all the complaints, Smith told her she "shouldn't have a conscience" because they "were making good money." Finally, Smith knew that the alleged 3 percent callback rate was a sham, and applicants testified that Smith increased the salary range for prospective jobs after they expressed disappointment.

The case against Price was equally strong. Volz testified Price came to speak with him about complaints on a number of occasions, more so as time went on. Volz tried to punt and redirect Price to Panice, but Price was perceptive. He confronted Volz on one occasion saying, "Tony, I know this is a scam. This is, you know--there is no jobs out there. Come on, who are you trying to fool? But I don't care as long as I keep getting paid." That in itself was enough evidence for the jury to rely on in reaching its guilty verdict as to Price.

Mitchell acknowledged that Receiver/ISCS was the same company that had scammed people in Rosemont. She also knew that folks thought the operation was a fraud – one so fiercely he threatened to kill everyone in the office – and other circumstances (cash payments, the move from Rosemont with Panice's dubious explanation) support the inference that she was in the know.

Rupert's role was unique in the sense that he only conducted the group interviews. That isolation may have shielded him from the inner workings of the scheme, but there was still

evidence suggesting that he knew what was going down.  For one, it is hard to believe that Rupert didn't know his statements to candidates about the acceptance rate were false.  A number of applicant witnesses said nothing as to Rupert's representations in this regard, but Allison Guerriero testified that she attended an orientation meeting where Rupert said approximately 10 percent would be called back for a second interview.  Volz testified Rupert typically represented a 3 percent callback rate.  In either case, that representation was way off: "virtually 100 percent" of the applicants made it to the second round.  It's possible Rupert remained ignorant of this disconnect throughout his 15-month tenure, but the testimony doesn't demand that conclusion.  And there was also evidence Rupert knew no jobs existed.  As time passed and the complaints mounted,[2] Rupert became so suspicious that he asked Volz whether anyone was actually finding work.  Although Volz said "yes," they were just being placed in different offices, Rupert plainly was not convinced--he asked Volz and Panice on several occasions to show him these offices.  They said they would be happy to do so, but, conveniently, the plans always fell through.  Rupert admitted that, in looking back, he could see the company wasn't legitimate.  He never admitted to knowing it was bogus at the time, but a reasonable jury could find that he did.

Viewing the evidence in the light most favorable to the prosecution, the verdict stands on firm ground.

The judgments of the district court are AFFIRMED.

---

[2] Because he encountered so many people, Rupert was an easy target for crestfallen applicants.  In fact, someone became so frustrated with him that they created a Web site in his honor: *IhateJosephRupert.com.*  Try telling Rupert "there's no such thing as bad publicity."