In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1351

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONELLA LOCKE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cr-00018—**Larry J. McKinney**, *Judge.*

ARGUED JANUARY 19, 2011—DECIDED JUNE 21, 2011

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. Donella Locke became a real estate agent in an ill-fated attempt to rebuild her credit and get out of debt. In 2008, she was indicted on fourteen counts of wire fraud or aiding and abetting wire fraud in violation of 18 U.S.C. §§ 2 and 1343—as well as a charge of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371—for her role in several real estate transactions. At trial, the government presented

evidence of only the five wire fraud counts in which Locke was the principal offender.

The jury convicted Locke on all five counts. We find that the district court did not plainly err in failing to strike witnesses' brief, candid use of the words "fraud" and "misrepresentation" while testifying about the significance of false information in Locke's loan applications, so we affirm her conviction.

The district court sentenced Locke to seventy-one months' imprisonment and ordered her to pay restitution, basing part of both the length of her sentence and the amount of restitution on conduct not necessarily encompassed in her charges of conviction. Because the district court's findings were insufficient to support this judgment, we vacate Locke's sentence and restitution order and remand for resentencing proceedings.

## I. BACKGROUND

Locke found herself mired in debt following the collapse of her family's childcare business in the late 1990s. Seeking to repair her credit, she purchased a book that detailed plans for escaping former credit problems. It included an advertised—though illegal—method for obtaining a new Social Security Number (SSN). She claims to have followed the book's guidance and instructions "to the letter," changing the addresses she used in correspondence and documents, obtaining a new SSN and social security card, and obtaining lines of credit through services advertised in the book.

By 2002, Locke had also become a licensed realtor and a licensed principal broker in the state of Indiana. She began purchasing and arranging for the purchase of residential properties in and around Indianapolis to use as rental units. Over the course of her transactions, Locke's methods became questionable and, ultimately, criminal. She received money from rushed closings for contracting work she never had completed, used false addresses in invoices from companies that did not exist, submitted loan applications with inflated incomes and account balances, and submitted forged documentation in support of loan applications.

A grand jury returned an indictment against Locke and her acquaintance, Beverly Ross, charging the pair with one count of conspiracy to commit wire fraud and a combined total of thirty-six counts of wire fraud that each involved a specific property. Locke was charged by herself with wire fraud in five of those counts (comprising the "Locke transactions") and was charged with aiding and abetting wire fraud in nine others. Ross pled guilty to one of the charged counts, leading the government to dismiss the others against her, while Locke proceeded to trial.

The government chose to present evidence only on the five counts involving the Locke transactions (Counts 8, 9, 10, 11, and 14). Each of the five underlying real estate transactions occurred between January and May 2005, and all five properties were in foreclosure within months—no more than one payment having been made on any property. In each transaction, Locke submitted a

loan application with falsified information and supporting documentation. To prove the materiality of Locke's falsehoods, the government called seven witnesses representing the lenders or mortgage brokers involved in the five Locke transactions. Each testified as to the influence of the inaccurate information in the lending decision, using variations of the words "fraud" or "misrepresentation" in doing so. We recount the testimony at issue in detail due to the importance of its context:

- Steven Newcomb testified for the wholesale lender involved in the Count 8 transaction. Asked whether the lender would have funded the loan if it had known the listed SSN had not been issued by the government, Newcomb answered that it would not "because we would not have an accurate representation of the borrower's full credit and credit rating and credit history." Asked if repeated inaccuracies would influence the decision, Newcomb answered in the affirmative because "it would just be a blatant misrepresentation of the borrower's credit."

- Mortgage broker Scott Chinn testified that if he had known the SSN listed in Counts 8 and 10 was false, "it would have killed the loan." The prosecutor asked why, and Chinn responded, "It's fraud." He then explained that the SSN is "how we pull the credit" and "see if the person can pay for the home."

- Mortgage broker Diane Taylor processed the application in Count 9. She testified that she would

have denied the loan had she known of the substantially lower income Locke reported in other applications: "[T]here would be some misrepresentation. There was . . . quite a variance in income . . . which would trigger to the underwriter that there was something not exactly correct. . . ."

- Pamela Ingalls, testifying as to Count 10, was asked how knowledge of the false SSN would have affected her lender-employer's decision on her loan. She answered that it would have been "fraudulent information on the loan application," noting that her lender would not have funded the loan. Ingalls was then asked how the credit decision would have been impacted by a discrepancy in how Locke reported her income on applications to different lenders. She responded that it would have changed the outcome because "fraudulent information may have been provided."

- James Orr, an officer for the mortgage placement firm involved in Count 11, was asked whether his firm would have forwarded the application to a lender had it known that the provided SSN was not legally issued. He responded that "we wouldn't have . . . [b]ecause it is obviously a misrepresentation of the facts with a [SSN] that does not belong to our applicant." He also explained that the income discrepancy would likewise have thwarted Locke's loan appli-

cation, "[b]ecause it is a misrepresentation of the income based on other information that was available."

- Vicky Bonardi, the operations manager for the Count 11 firm, testified that the lender would not have funded the loan knowing the SSN or the stated income were misrepresented because the falsehoods would prevent the lender from verifying employment or income stability. She answered that the loan would not have closed if the lender had known of a falsified address in the application packet because "there's obviously some what we call funny business or misrepresentation."

- Peggy Cansdale stated that, if her lender employer had known the SSN on the loan application in Count 14 was not Locke's assigned number, it "wouldn't have made the loan." Asked why, she said, "Fraud. It would be fraud on the loan. The credit doesn't belong to her, and documents have been altered." At the end of her testimony, she noted her company's lending policy: "Even if [a credit profile] is misrepresented once, we kill it. We have a zero tolerance for fraud."

Locke testified on her own behalf at trial, asserting a good-faith defense. She insisted she had merely relied on the instructions in the credit-repair book, never believing her actions to be illegal or deceitful. She urged that she was not the source of much of the inaccurate information in the applications and that she was

unaware that any lender had ever been misled. She also denied having forged or falsified any document.

The jury was not convinced. After the government rested its case without presenting evidence as to the conspiracy or aiding and abetting charges, Locke moved for a judgment of acquittal on those charges. The district court ultimately granted her renewed motion and instructed the jury as to the wire fraud charges only, focusing on the specific intent requirement. The jury found Locke guilty on each of the five remaining counts.

At the sentencing hearing, the district court sustained one of Locke's objections to the presentence report (PSR). It then calculated her offense level to be 25—a base offense level of 7 for an offense involving fraud, increased by 16 points because the loss amount exceeded one million dollars, further increased by 2 points because the offense involved ten or more victims. Because Locke had no prior criminal history, the district court calculated the advisory range to be 57 to 71 months. After considering all relevant factors, the district court sentenced her to 71 months' imprisonment. It also ordered her to pay $2,360,914.51 in restitution to thirteen victims. In its subsequent statement of reasons, the district court adopted the PSR, except for the recommendation it had rejected at the sentencing hearing. Locke timely appealed.

## II. ANALYSIS

Locke presents three issues on appeal, challenging both her conviction and sentence. She first argues that

her conviction must be reversed because the district court erred in not striking inappropriate testimony from certain government witnesses. She alternatively argues that we must remand this case for resentencing because the district court erroneously based her sentence length and restitution order on unconvicted conduct. We will address each issue in turn.

*A. Challenge to Conviction*

For the first time on appeal, Locke contends that the district court erred by not striking a portion of the testimony from each of seven government witnesses. Because she neither objected to their testimony nor requested a limiting or curative instruction, we review this issue for plain error only. *United States v. Noel*, 581 F.3d 490, 498 (7th Cir. 2009). To prevail, Locke must show that (1) the district court erred in not striking the witnesses' testimony, (2) its error was obvious or clear, (3) the error affected her substantial rights, and (4) the error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005).

Specifically, Locke takes issue with the witnesses' use of the words "fraud" and "misrepresentation" in their responses to prosecutors' questions about the significance of false information on Locke's loan applications according to the lenders' underwriting guidelines. Her arguments may be distilled to two salient contentions. First, these witnesses should not have been allowed to testify as to their opinions, which she describes as

reaching legal conclusions and commenting on her intent. Second, their testimony misled the jury, effectively instructing it that incorrect information on loan applications amounts to fraud *per se,* thus eliminating the specific intent element of wire fraud.[1]

### 1. Admissibility of Lay Witness Opinion Testimony

We begin by noting these witnesses were not testifying as experts. The Federal Rules of Evidence limit—but do not bar—lay witnesses' ability to testify as to their opinions and inferences, even about ultimate issues in the case.[2] In some situations, even "lay opinion

---

[1] Conviction under the wire fraud statute, 18 U.S.C. § 1343, requires the defendant to have willfully acted "with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Howard,* 619 F.3d 723, 727 (7th Cir. 2010) (*quoting United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002)).

[2] The testimony of a witness "in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). But the Rules treat inferential testimony of expert and lay witnesses differently. The second half of Rule 704 provides, "No *expert* witness testifying with respect to the mental state . . . of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state . . . constituting an element of the crime charged. . . ." Fed. R. Evid. 704(b)

(continued...)

testimony as to the mental state of another is indeed competent," *United States v. Bogan*, 267 F.3d 614, 619 (7th Cir. 2001) (*quoting United States v. Guzzino*, 810 F.2d 687, 699 (7th Cir. 1987)), and it is within the discretion of the trial judge to determine whether such testimony is helpful under Rule 701 and appropriate under Rule 403's balancing test, *Bohannon v. Pegelow*, 652 F.2d 729, 732 (7th Cir. 1981). Our analysis, then, turns not on whether the witnesses' testimony obliquely implicated Locke's intent. Instead, we look to Rule 701's helpfulness requirement to assess the witnesses' testimony in this case.[3] We ask whether the district court rightfully could have determined, in its broad discretion, that these lay witnesses' testimonies were helpful to the jury and not meaningless assertions. *See United States v. Allen*, 10 F.3d 405, 415 (7th Cir. 1993).

---

[2] (...continued)
(emphasis added). "Since neither Rule 701 nor Rule 704(a) limits the subject matter of lay opinion testimony, there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others." *United States v. Rea*, 958 F.2d 1206, 1214-15 (2d Cir. 1992).

[3] Lay witness testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Locke does not attack the witnesses' testimony on the first or third grounds.

Locke argues that the witnesses' answers should have been stricken because their opinions, which bordered on legal conclusions, were inherently unhelpful. She cites *United States v. Van Eyl*, 468 F.3d 428, 432-33 (7th Cir. 2006), for the proposition that the court plainly erred in permitting witnesses to testify using the words "fraud" or "misrepresentation." In *Van Eyl*, the district court had granted the defendant's in limine motion to exclude lay opinion testimony on conclusions of fraud because "the court feared the jury would conclude that if others thought the conduct was wrong, then Van Eyl must have possessed the intent to defraud." *Id.* at 437. We found that the exclusion was well within the district court's discretion, *id.*, but we did not simultaneously deem inadmissible all lay opinion testimony that possibly implicates intent.

Locke also relies upon an isolated line from our decision in *United States v. Noel* for her argument that lay witnesses' legal conclusions are impermissible: "We have held repeatedly that lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by 701(b)." 581 F.3d 490, 496 (7th Cir. 2009). But she neglects to read that phrase within the context of the testimony challenged in *Noel* and the cases we cited for support—context that needs to be considered as we evaluate the testimony in each case. In *Noel*, a detective serving as a prosecution witness described various photographs found on the defendant's computer and opined that they fit the statutory definition of child pornography. *Id.* at 494. We held the testimony was not helpful to the jury because it "amounted

to nothing more than a statement that the photos were illegal." *Id.* at 496-97.

We decline Locke's invitation to glean too broad a rule from *Noel.* Properly read, *Noel* underscores two points relevant to this case. First, a lay witness's opinion or inference testimony must be helpful to the finder of fact in order to be admissible. *Id.* at 496. Second, a witness's opinion that the facts in a case meet the elements of the charged crime will likely constitute unhelpful testimony because it merely tells the jury what result to reach. *Id.* at 497. Neither of these two propositions shows that the district court committed any clear or obvious error here.

### 2. *Propriety of the Witnesses' Testimonies*

To convict Locke, the government needed to prove that the inaccuracies in her loan applications and real estate transaction documents were material. *Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009). Locke's representations were material if they could have influenced the victims' decisions. *United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008). Lay opinion testimony, which "provides the jury with a more complete picture than would be provided by a recitation of each component fact," *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002), could shed light on the materiality of Locke's falsehoods.

The witnesses were officers or employees of the mortgage brokerages or lenders involved in the Locke transac-

tions. As shown by the sequence of questions and re-sponses recounted above, the government introduced each witness to testify as to the prevalence of the false information in the loan documents and the significance of the falsehoods under the lenders' guidelines. We easily conclude that their opinions about the false-hoods' influence on the loan decisions would have helped the jury reach a conclusion regarding the mate-riality element of the wire fraud charges.

Having found that the testimony could have been helpful, we consider whether the testimony impermis-sibly communicated that the facts in Locke's case met the elements of wire fraud—that is, whether the challenged testimony merely told the jury what conclu-sion to reach. Had the prosecutors deliberately elicited testimony about whether Locke knowingly made a mate-rial misrepresentation to deprive the lenders of money, their questions "would have required an answer in the form of a legal conclusion that would have been unhelpful opinion testimony." *United States v. Hach,* 162 F.3d 937, 945 (7th Cir. 1998). We are not convinced that the witnesses' testimonies can be classified as legal con-clusions, let alone such directive ones.

Locke asserts that the mere use of the words "fraud" and "misrepresentation" conveyed the witnesses' "unex-pressed, and perhaps erroneous, legal standards to the jury." *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). But the testimony Locke challenges is far afield from the unhelpful, bare-legal-conclusion testimo-nies in *Noel* and *Torres*. Witnesses in both cases opined

on the application of the exact statutory elements in-
volved in the case. *Noel*, 581 F.3d at 497 ("She, in essence,
told the jury nothing more than, 'I am familiar with the
definition of child pornography, and this meets that
definition. . . . "); *Torres*, 758 F.2d at 151 ("[T]he question
tracks almost verbatim the language of the applicable
statute."). *Accord United States v. Scop*, 846 F.2d 135, 142
(2d Cir. 1988) (same).

By distinct contrast, the prosecutors' questions here did
not invoke any of the wire fraud statute's language,[4] and
they did not call for opinions on whether its elements
were fulfilled. The witnesses' responses likewise neither
approached the statutory language nor commented on
Locke's specific intent in any way. Rather, each witness
explained why the loan in question would have been
disapproved by using "fraud" or "misrepresentation" in
a colloquial sense, employing the vernacular of their
financial professions. *See United States v. Hearst*, 563
F.2d 1331, 1351 (9th Cir. 1977) (testimony not objec-
tionable when average laymen would understand the
terms used and ascribe them the same basic meaning
intended by the witness). The jurors could hardly

---

[4] "Whoever, having devised . . . any scheme or artifice to
defraud, or for obtaining money or property by means of
false or fraudulent pretenses, representations, or promises,
transmits or causes to be transmitted by means of wire . . .
communication in interstate . . . commerce, any writings . . .
for the purpose of executing such scheme or artifice, shall
be fined under this title or imprisoned not more than 20
years, or both." 18 U.S.C. § 1343.

confuse the words "what we call funny business or mis-representation" with commentary on the elements of wire fraud.

Neither did the prosecutors' questions or the witnesses responses call the jurors' attention to Locke's intent—though even if they had, such testimony is not necessarily inappropriate. *See Bogan*, 267 F.3d at 619-20; *Bohannon*, 652 F.2d at 732. The witnesses were commenting on how their companies react to false information on applications, not on Locke's *mens rea*. *See United States v. Owens*, 301 F.3d 521, 527 (7th Cir. 2002) (witness's use of phrase "misleading and fraudulent" to describe reports did not comment on defendant's state of mind); *United States v. Liner*, 435 F.3d 920, 924 (8th Cir. 2006) (implication that program was fraudulent did not directly address defendant's intent to defraud). The witnesses' words—read within the context of the questions and the full responses—must be stretched beyond their capacity for us to conclude that the district court allowed multiple witnesses to testify that Locke intended to deceive the lenders and thus committed wire fraud.

Had Locke properly preserved this issue for review, *see* Fed. R. Evid. 103, we might have determined that the district court abused its discretion by not striking the testimony at Locke's request. *See United States v. Wantuch*, 525 F.3d 505, 514 (7th Cir. 2008). Alternatively, the district court might have admonished the prosecutors and witnesses to avoid words that can be construed to have legal baggage. *See United States v. Espino*, 32 F.3d 253,

257 (7th Cir. 1994) ("A more appropriately phrased question . . . could have avoided the problem of compelling the defendant to offer testimony requiring a legal conclusion."). But the bottom line is that Locke never objected to the testimony, let alone alerted the district court to her underlying concerns. Under the circumstances, we certainly cannot conclude that any error in the district court's failure to strike the testimony *sua sponte* was "clear or obvious, rather than subject to reasonable dispute," as the plain error doctrine requires. *Puckett v. United States*, ___ U.S. ___, 129 S. Ct. 1423, 1429 (2009). Accordingly, we reject Locke's contention that the witnesses should not have been allowed to testify regarding their opinions because they reached legal conclusions and spoke of her intent.

Locke's second contention—that the challenged testimony misled jurors by giving them "de facto" instructions on the law—achieves little more traction. We can imagine that the witnesses' use of "fraud" and "misrepresentation" may have confused the jury as to wire fraud's elements, at least initially. *See United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980). But any such confusion was extinguished when the district court appropriately instructed the jury regarding wire fraud. It expounded on specific intent, explaining both that Locke must have intended to deceive or cheat the victims to gain money or property and also that good faith would be inconsistent with guilt. The district court made clear that, to convict, the jury had to find that Locke "realized what she was doing, was aware of the nature of her conduct, and did not act through

ignorance, mistake or accident." Locke does not argue
that the jury was unable to follow the district court's
instructions, so we presume its verdict comported with
those instructions. *See United States v. Ochoa-Zarate*, 540
F.3d 613, 620 (7th Cir. 2008). Any ephemeral "de facto"
instruction was displaced by the district court's expan-
sive instructions, so Locke was not prejudiced.

Finally, we do not find that Locke's substantial rights
could have been affected by any error in failing to strike
the testimony. The evidence against her was diverse and
robust, including proof of multiple forgeries, falsified
account balances and incomes, and use of phony busi-
nesses and addresses. Locke's good-faith defense re-
quired the jury to disbelieve her family members' testi-
mony about forgeries and faxing a document on Locke's
behalf; to blame mortgage brokers for falsified residential
leases, inaccurate income and account balance reporting
in loan applications, and fake addresses on documents;
and to disregard fake invoices from Locke's purported
vendors. We conclude that Locke would not have been
acquitted had the district court struck the sporadic,
repeated use of two words with potential legal baggage
in the course of otherwise appropriate questioning and
testimony. *See United States v. Avila*, 557 F.3d 809, 821
(7th Cir. 2009).

In summary, we do not find that the district court
plainly erred in failing to strike the witnesses' challenged
testimony *sua sponte*. The testimony was helpful to the
jury, as it shed light on the materiality element of wire
fraud. The testimony neither told the jury what conclu-

sion to reach nor instructed the jury that wire fraud is a strict liability crime. Further, the overwhelming evidence in the case would have led to Locke's conviction even in the absence of this testimony. Accordingly, her convictions must stand.

## B. *Challenges to Sentencing*

Locke contends that we must remand her case for resentencing even though we find her conviction to be sound. She presents two issues with the sentencing court's judgment. Her first issue involves the length of her incarceration, while the second involves the amount of restitution ordered. Both issues turn, however, on whether the district court erroneously considered unconvicted conduct in arriving at its conclusions.

### 1. *Offense Level and the Number of Victims*

To determine the guidelines-recommended sentence, the district court needed to determine both the amount of loss and the number of victims involved in Locke's crimes. *See* U.S.S.G. § 2B1.1(b)(1)-(2). Locke acknowledges that both factors must include conduct relevant to, but not specified within, her counts of conviction—that is, acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). *See also United States v. Smith*, 218 F.3d 777, 783 (7th Cir. 2000). She contends, however, that the district court did not make the findings necessary to support basing her offense level on "relevant

conduct" from several counts that were dismissed at trial. We review a district court's factual findings during its determination of the offense level for clear error, reversing only when we are "left with the definite and firm conviction that a mistake has been made." *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010) (*quoting United States v. Wyatt*, 102 F.3d 241, 246 (7th Cir. 1996)).[5] Even the deferential clear error standard "cannot cure an absence of findings on key elements of the [relevant conduct] analysis." *United States v. Fox*, 548 F.3d 523, 532 (7th Cir. 2008).

During Locke's sentencing hearing, the district court calculated Locke's offense level to be 25 by including a two-level increase because her offenses involved ten or more victims. *See* U.S.S.G. § 2B1.1(b)(2)(A). The prosecutors had presented their view of Locke's entire fraudulent scheme during sentencing arguments, urging the district court to adopt the unconvicted counts as relevant conduct in sentencing. The government concedes that the five counts on which Locke was convicted did not involve ten or more victims, but argues that the district court correctly found that the victims

---

[5] There is some confusion whether Locke preserved her challenge to an offense level increase based on the number of victims exceeding those in her counts of conviction. If Locke forfeited this issue, we would ordinarily review for plain error only. *United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010). But the government suggested clear error review. (Appellee's Br. at 44.) "Hence, we review the district court's relevant conduct determinations for clear error." *Salem*, 597 F.3d at 884.

involved in the dismissed counts should be included in the offense level calculation because they were directly harmed by Locke's "relevant conduct."

The district court noted that the issue before it in setting the offense level was "whether the conduct that was charged and the other counts that weren't tried amounts to relevant conduct." (Sent. Tr. at 19.) It then stated that "the law in relevant conduct is fairly clear and adequately cited by the Government. It causes the Court to find that 2 points extra is correct. . . . It is relevant conduct because of the case law . . . cited by the Government." *Id.* Later, when discussing its guidelines range calculation, the district court explained that the amount of money and the number of victims involved impacted Locke's range: "I've added the 2 points. I think it's appropriate to talk about . . . 10 victims or more because of the relevant conduct in this case." *Id.* at 37. The court made no further comments regarding relevant conduct and did not explicitly adopt the PSR at the sentencing hearing.

For the dismissed counts to constitute relevant conduct, the acts in those counts must have been both attributable to Locke and also part of a single scheme common to the counts of conviction. *United States v. Pira*, 535 F.3d 724, 728 (7th Cir. 2008). Because the allegations in those counts were not proven at trial, the district court needed to determine—by a preponderance of the evidence—that the events occurred and fell within § 1B1.3's purview. *United States v. Ojomo*, 332 F.3d 485, 489 (7th Cir. 2003). That determination should be

explicitly stated and supported either at the sentencing hearing or in a subsequent written statement of the district court's reasoning. *Id.* The statements need not be particularly robust, but they must satisfy us that the district court considered the evidence and concluded that the conduct indeed had the requisite relationship to the convictions. *See id.* at 490; *Smith*, 218 F.3d at 783.

More importantly, there must be evidence before the sentencing court to support a "relevant conduct" finding. Each case affirming a sentence involving relevant conduct in the face of "a paucity of explicit findings by the sentencing judge," *Smith*, 218 F.3d at 783, had one factor in common: sufficient, objective evidence in the record. *E.g.*, *United States v. Wilson*, 502 F.3d 718, 721, 723 (7th Cir. 2007) (defendant's confession and witnesses' statements at trial and sentencing); *Smith*, 218 F.3d at 784 (findings "backed up by the objective evidence"); *United States v. Acosta*, 85 F.3d 275, 279-80 (7th Cir. 1996) (adopted PSR and corroborated testimony); *United States v. Thomas*, 969 F.2d 352, 355 (7th Cir. 1992) (defendant's admission of narcotics sales). The opposite result obtains in cases where both the findings and supporting evidence are deficient. *E.g.*, *United States v. Ortiz*, 431 F.3d 1035, 1042-43 (7th Cir. 2005) (the "district court's terse findings" and the government's "non-existent" evidence of relevant conduct criteria required finding of clear error); *United States v. Bacallao*, 149 F.3d 717, 720-22 (7th Cir. 1998) (lack of independent findings and reliance on PSR inadequate because nothing in the record or PSR supported relevant conduct finding); *United States v. Duarte*, 950 F.2d 1255, 1264-65 (7th Cir.

1991) (neither evidence at trial and sentencing nor PSR supported relevant conduct conclusion). Without any evidence to serve as the denominator, a sentencing court obviously cannot find conduct to be relevant by a preponderance.

Locke argues that the district court lacked evidentiary support for its relevant conduct finding. We agree. Nine of the fourteen counts against her were dismissed at trial without any evidence having been presented, and no evidence regarding her participation in the transactions underlying those counts was presented at sentencing. Although the government wished to avoid "putting on several little mini-trials" at sentencing, (Sent. Tr. at 7), it retained the burden of proving that any fraud in those other transactions was attributable to Locke and was part of a common plan.

The government correctly asserts that the district court may rely on uncontested portions of the PSR as findings of fact. *See* Fed. R. Crim. P. 32(i)(3)(A); *United States v. Ali*, 619 F.3d 713, 719 (7th Cir. 2010). It argues that Locke's failure to object to these sections constituted an admission to the conduct necessarily involved in reaching the sums listed, enabling the court to rely on those uncontested paragraphs as findings of fact in its offense level determination. But this reasoning suffers from three infirmities. First, Locke at all times denied any knowing involvement in frauds perpetrated in the unconvicted transactions. Second, the PSR contains no discussion relating those transactions to Locke's common scheme or plan. *See United States v.*

*Sumner*, 265 F.3d 532, 539-40 (7th Cir. 2001). So far as we can discern, the PSR's only information regarding the victims of these transactions is a list of lenders, addresses, and dollar values in the amount of loss and restitution paragraphs. Third, the district court must actually adopt the PSR or its reasoning. The district court adopted the PSR, but only after the fact and only by checking a box without further explanation. "Although the adoption of a PSR's findings in this manner may suffice under a plain error standard of review, it is inadequate when reviewed for clear error." *Salem*, 597 F.3d at 888.

In this case, the district court "simply intoned the words 'relevant conduct' and pronounced sentence," *Thomas*, 969 F.2d at 355, without explaining what facts of the case justified such a finding. Given the lack of evidence before the district court and the lack of an explicit adoption of a PSR containing an adequate relevancy analysis, we are left with the definite and firm conviction that the district court made a mistake in considering the transactions underlying the dismissed counts as relevant conduct. Accordingly, we conclude that the district court clearly erred in determining Locke's offense level to be 25.

The district court sentenced Locke to 71 months' incarceration, the top of the 57-to-71-month recommended range it had calculated. Had the additional victims not been included in the offense level calculations, Locke's offense level would have been 23 (corresponding to a guidelines range of 46 to 67 months). The district court,

quite possibly, would have selected the shorter period of 67 months had the "relevant conduct" been excluded, so we do not find this error harmless.

At the same time, we acknowledge that the district court might find—based upon sufficient evidence presented during resentencing—the conduct in the unconvicted counts relevant to Locke's sentencing. It could then state its findings with specificity and, presumably, enter the same sentence we vacate today. We express no opinion on the propriety of that outcome. Because no particular outcome is certain, we remand for resentencing. *See United States v. Zahursky*, 580 F.3d 515, 528 (7th Cir. 2009).

### 2. Restitution Order

Locke also takes issue with the district court's restitution order based on reasons similar to—but analytically distinct from—her relevant conduct argument. The district court ordered her to pay restitution to thirteen payees in the amount of $2,360,914.51, while her five counts of conviction impacted only seven victims and totaled $1,371,476.51. Because $989,438.00 of the ordered amount was apparently based on non-convicted conduct, Locke concludes, we should vacate the restitution order and remand for determination of an appropriate amount.

We ordinarily review restitution orders for an abuse of discretion, reversing if the district court considered inappropriate factors or failed to exercise its discretion.

*United States v. Frith*, 461 F.3d 914, 919 (7th Cir. 2006). But because Locke failed to object to the restitution calculation during the sentencing hearing, she concedes we should review the district court's order for plain error only.[6] *See United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010). We have previously held that requiring a defendant "to pay several thousand dollars in restitution, without a statutory basis for doing so," constitutes plain error by affecting the defendant's substantial rights and implicating "the fairness of the judicial process." *United States v. Randle*, 324 F.3d 550, 558 (7th Cir. 2003).

Federal courts may only order restitution where specifically authorized or required to by statute. *United States v. Webber*, 536 F.3d 584, 601 (7th Cir. 2008). Locke cites *United States v. McGee* in support of her argument that the district court could take "relevant conduct" into account while computing a prison sentence, but that restitution "may not be awarded with respect to other losses . . . unless the defendant consents to this additional

---

[6] The government argues that Locke waived any opposition to the restitution order by not objecting to the PSR's proposed restitution amount while she did object to the loss amount, the number of victims, a bankruptcy fraud increase, and the guidelines range. We disagree. Locke continually opposed any sentence based on unconvicted conduct, and any failure to specifically address the paragraph proposing a restitution amount lacked strategic motivation. We therefore find this issue forfeited, not waived. *United States v. Pineda-Buenaventura*, 622 F.3d 761, 766 n.2 (7th Cir. 2010).

award." 612 F.3d 627, 635 (7th Cir. 2010). But this blanket argument overlooks those circumstances—not at play in *McGee*—in which defendants must remunerate victims who are not specifically identified or involved in the counts of conviction. *See United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) ("Restitution is . . . not confined to harm caused by the particular offenses of . . . convict[ion]."). As crimes against property, Locke's wire fraud convictions fall within a mandatory restitution statute, 18 U.S.C. § 3663A, created by the Mandatory Victim Restitution Act ("MVRA"). If the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity," the MVRA requires restitution for "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

A wire fraud conviction requires the government to prove that "the defendant participated in a scheme to defraud," *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010), so the MVRA required the district court to order restitution for all victims of Locke's conduct in the course of her scheme. We have previously noted that the crime comprehended by the mail and wire fraud statutes is the scheme to defraud, not just the isolated iterations of wire transmissions or mailings, so restitution for victims of the overall scheme is required. *See United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006). Accordingly, "[a]s long as the [sentencing] court can adequately demarcate the scheme, it can order restitution for any victim harmed by the defendant's conduct during the course of that scheme." *Smith*, 218 F.3d at 784.

Other circuits have arrived at the same conclusion. *E.g.*, *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996) ("[W]here a defendant is convicted of defrauding person X and a fraudulent scheme is an element of that conviction, the sentencing court has power to order restitution for the loss to defrauded person Y directly caused by the defendant's criminal conduct, even where the defendant is not convicted of defrauding Y"); *Booth*, 309 F.3d at 576 (same).

In constructing a restitution order for Locke's multiple wire fraud convictions, therefore, the district court should have made specific findings regarding Locke's scheme or schemes to ensure its order complied with the MVRA.[7] *See United States v. Bennett*, 943 F.2d 738, 741 (7th Cir. 1991). Although Locke's indictment certainly alleged a single overall scheme, the government did not pursue the conspiracy charge or many of the individual transaction counts at trial. If the counts of conviction were merely five iterations of her overall scheme to

---

[7] We caution that this is not the same analysis as in "relevant conduct" determinations, as "relevant conduct" is not within the scope of the MVRA. *Frith*, 461 F.3d at 920. Yet the evidence supporting each may overlap, and the necessary findings may ring similar on the record. *See United States v. Hensley*, 91 F.3d 274, 278 (1st Cir. 1996) ("[I]n determining whether particular criminal conduct comprised part of a unitary scheme to defraud, the sentencing court should consider the totality of the circumstances, including the nature of the scheme, the identity of its participants and victims, and any commonality in timing, goals, and modus operandi.").

defraud, the order would likely have been permissible. *See Belk*, 435 F.3d at 819; *United States v. Mitrione*, 357 F.3d 712, 721-22 (7th Cir. 2004) (restitution order including Medicare not plainly erroneous though count of conviction only specified Medicaid as a victim because defendant's crime included a scheme and Medicare was directly harmed by the scheme), *vacated on other grounds*, 543 U.S. 1097 (2005). But if the counts of conviction comprised five individual, discrete schemes to defraud, the issued restitution order would be impermissible. *Cf. Frith*, 461 F.3d at 920. The ultimate question, then, is whether Locke's counts of conviction comprised a unitary scheme.

The district court's findings on the record were insufficient to answer that question and support the restitution order it pronounced. The district court never discussed its restitution decision during sentencing. It did increase the offense level by two points based on the involvement of more victims than those listed in the counts of conviction, but it did not explain how those victims were directly harmed by Locke's scheme or schemes. *See Randle*, 324 F.3d at 556. It did state that Locke's "offense took place over the two-year period with all of the attendant dishonesty contained within this scheme." (Sent. Tr. at 38.) But a subsequent statement may cut against the suggestion that a single scheme existed: "I don't think [the guidelines] take into account the length of time over the course of two years and the number of separate wire *frauds*." *Id.* at 41 (emphasis added). The district court made no findings as to (1) whether the counts involved individual

schemes, as suggested by the discrete charges, or were part of an overall scheme or pattern of criminal conduct; (2) the scope of Locke's scheme or pattern of criminal activities, if a single scheme or pattern is found; and (3) which victims were harmed by Locke's conduct within that scheme or those individual schemes.

The court erred in ordering her to pay restitution to victims not clearly harmed by the conduct in Locke's counts of conviction, and this error affected her substantial rights. *See Randle*, 324 F.3d at 558. To ensure the fairness and integrity of the judicial process, we exercise our discretion to vacate the order and remand the matter for the district court's reconsideration. As with the relevant conduct determination discussed above, we express no opinion as to the propriety of arriving at the same restitution order on remand if the district court finds a single pervasive scheme. But the determination should be made by the district court in the first instance.

### III. CONCLUSION

The district court did not plainly err in failing to strike the testimony of government witnesses, so we AFFIRM Locke's conviction on five counts of wire fraud. The district court clearly erred, however, in setting Locke's offense level without making sufficient findings regarding the number of victims involved in her crimes. It also plainly erred in ordering Locke to pay restitution to victims without making sufficient findings regarding the scope of her scheme or schemes to defraud. Accord-

ingly, we VACATE her sentence and restitution order and REMAND for resentencing proceedings consistent with this opinion.